IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| ANDREW S. GOLDSTEIN, <br> TRUSTEE FOR JASON B. CLARK <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL CASUALTY COMPANY, <br><br> Defendant. | Case No. 4:07CV00028 <br><br> **MEMORANDUM OPINION** <br><br> By: Jackson L. Kiser <br>     Senior United States District Judge |

Before me is Defendant's Motion for Summary Judgment. I reviewed the briefs and the supporting evidence. The matter is now ripe for decision. For the reasons stated below, I will GRANT the Motion and DISMISS the case.

**I.     STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Jason Clark ("Clark") was an independently contracted truck driver. In 2001 Clark was involved in an accident as he was attempting to pull out of a lot and onto a major road. He has always maintained that he stopped, looked both ways, and only saw the other car as his truck was already in the middle of the road and that the other driver had ample time to slow down and stop. The police officer who arrived at the scene recorded as statement which was much more damaging to Clark. Clark maintains that the officer misunderstood him. To this day Clark contends that he was not at fault and that he should not have been held liable.

Mr. Haney, the other driver in the accident, was unfortunately killed. Mr. Haney's family (the "Haneys") then sued Clark, who was insured by National Casualty Company ("National"). The suit sought damages of twenty-five million dollars. National hired Wooten

1

Hart, PLC, to represent Clark and his company. National also paid for an independent investigation of the accident, and hired experts to aid in the defense.

National sent a letter to Jason Clark on January 18, 2002. That letter states:

> Since the Plaintiff's lawsuit asks for an amount much greater than the amount of your coverage, we must point out that it is possible a jury might award sums greater than your coverage. National Casualty Company cannot be responsible for the payment of any amount in excess of the limit of liability stated in the policy for the settlement of any claim or satisfaction of any judgment which may be rendered. You may, therefore, be personally liable for such amount.

The letter also advised Clark that he could retain his own attorney at his expense if he chose to do so.

The traffic consultants analyzed the vehicles, the site conditions, the skid marks, and gouge marks. They also interviewed Clark as well as other witnesses. They submitted a report to National which included the following conclusions:

- "Mr. Haney perceived and reacted to the accelerating truck/trailer combination when he was approximately 121-144 feet from impact. The available sight distance to Mr. Haney was in excess of 500 feet. Mr. Haney clearly failed to properly perceive and react to the clearly visible and illuminated 1994 truck/trailer combination."
- "If attentive, Mr. Haney could have stopped his vehicle approximately 222-298 feet from the truck/trailer combination."
- "The primary cause of this crash was Mr. Haney's failure to react for approximately 2.8-4.5 seconds. The reason for Mr. Haney's failure to react is unknown but could be due to fatigue or driver inattention."

Susan Waddell ("Waddell") was the primary defense attorney on the case. Waddell believed that probability of obtaining a verdict for the defendants was very good based on the lack of evidence of Clark's negligence and evidence supporting contributory negligence. She relayed this optimism to James Spence ("Spence"), the lead adjuster on the case for National.

Waddell also filed a "Defense Attorney's Suit Status Report" with National on October

15, 2004. In it she predicts a 55% chance of a verdict for the defense, and a potential verdict range of $1,000,000-$1,500,000 if the Plaintiff prevailed. This was based partially on claims for future loss of income in the amount of $884,000. Waddell admits that the Haneys' version of events is supported by "certain statements made to the trooper by [Clark] contemporaneously with the accident." Also, she explained that the decedent's "wife and minor children will be sympathetic." She recommended a settlement offer of $100,000. Lastly she recommended that "if a demand is received within the policy limits, [the defense] should at least consider proposing mediation."

On November 12, 2004, the Haneys made a settlement offer of $1,000,000. Spence forwarded this letter to Clark within several days. This offer was rejected. On January 25, 2005, Waddell sent Spence a letter indicating that the plaintiffs would not agree to mediation. Further, she noted that she would press for a directed verdict.

During this same time period, Spence exchanged emails with John L. Cooley ("Cooley"), a partner at Wooten Hart. Spence stated: "Case has seemingly morphed from what I had understood was a solid liability defensive posture into a 50/50 crap shoot – I am surprised and taken aback." Cooley responded: "I think evidence wise, [sic] we have a good case . . . I see the risk of a [verdict for the Haneys] in the sympathy [for the widow] and the statement from [Clark] . . . I see our chance of a defense verdict as a little better than 50/50, but there is that down side." Spence responded that he thought the widow will lose credibility because she works in the hospital records department and the hospital was unable to come up with the decedent's emergency room records. Further, he thought there was a good chance of getting a contributory negligence jury instruction. In light of these, he wrote: "I am puzzled as to why you would rate

3

chances for a successful defense at a mere 50%."

On August 29, 2005, Waddell submitted another status report. Her suggested settlement value remained at $100,000. The trial began on October 25, 2005. After the first day of trial Waddell believed the case was going well and spoke with Spence and gave him an update.

During trial the Haneys reduced their settlement offer to $925,000. Waddell did not believe this was appropriate and Spence decided not to increase National's offer in response. Waddell says that she informed Clark of the offer, but this is contested.

On October 28, 2005, the jury returned a verdict for $2.5 million. National paid its $1,000,000 policy limit. The Haneys offered to release Clark from his debt in exchange for his assignment to them of a bad faith claim against National. Mr. Clark rejected the offer and relayed this information to Waddell in an email dated December 22, 2005. In that email he relays that he attempted to settle his debt of $1.5 million with an offer of $7,000. He also states that he didn't blame Waddell for the result, saying "sometimes things just don't go the way they should." Mr. Clark was forced to declare bankruptcy.

Clark's bankruptcy trustee, Andrew S. Goldstein ("Goldstein"), then filed the present action alleging bad faith by National. In a sworn deposition, Clark explains that he understood that an excess verdict was possible and that he would be responsible for any portion of the verdict greater than $1,000,000. Of course he expected to win, but he understood that it was not a sure thing. He also understood that his statement at the scene and the appeal of the widow could be damaging. He admits speaking several times with National and Waddell about contributory negligence. Further, he told National that they should not pay the policy limits, and that National didn't owe the plaintiffs anything. He also knew about the $1,000,000 settlement

4

offer, but he "wanted to go to court to fight it." (Clark Dep. 44.) He was unaware of the $925,000 offer, and couldn't say what he would have done had he known about it. Moreover, he was unaware of any offer during trial. When asked by the Haneys to assign the bad faith claim, he responded that he did not think there was any bad faith.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).

A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. *Id.* at 255. Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.,* 800 F.2d 409, 411–12 (4th Cir. 1986). In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.,* 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

The very existence of a scintilla of evidence or of unsubstantiated conclusory allegations, however, is insufficient to avoid summary judgment. *Anderson,* 477 U.S. at 248–52. Rather, the Court must determine whether the record as a whole could lead a reasonable trier of fact to find for the non-movant. *Id.* at 248.

## III.    DISCUSSION

This action comes to me on the basis of the diversity of the parties, and I must therefore apply the substantive law of Virginia. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270,

5

275 (4th Cir. 2007). In Virginia, "an insured, in order to recover for an excess judgment on the ground that the insurer failed to take advantage of an opportunity to settle within the policy limits, is required to show that the insurer acted in furtherance of its own interest, with intentional disregard of the financial interest of the insured." *State Farm Mut. Auto. Ins. Co. v. Floyd*, 235 Va. 136, 366 S.E.2d 93, 97 (1988). Further, because bad faith requires proving more than simply negligence and because there is a presumption of good faith, the insured must make the necessary demonstration by clear and convincing evidence. *Id.* at 98.

The underlying case in *Floyd* grew out of a head-on collision. *Id.* at 94. Defendant Floyd maintained throughout the case that the plaintiff, and not he, had crossed the center line. *Id.* He told counsel that he did not want the plaintiff to be paid anything since she was at fault. *Id.* State Farm conducted an investigation and determined that liability was doubtful. *Id.* Floyd's father consulted an attorney who thought that any verdict returned would likely be within the policy limit of $55,000. Therefore Floyd did not retain personal counsel. *Id.*

The only damaging evidence on the issue of liability was testimony by a state trooper regarding gouge marks in the road which started over the center line and extended to where Floyd's car ended up. *Id.* at 95. The defense attorney wrote to State Farm before trial indicating that the chance of a defendant's verdict was very good and that a plaintiff's verdict would be between $15,000 and $35,000. The plaintiff offered to settle for $45,000 and State Farm countered at $15,000. *Id.* Floyd was not told of the plaintiff's settlement offers. *Id.* The jury returned a verdict against Floyd in the amount of $100,000. *Id.* State farm paid its limits and the balance fell to Floyd. *Id.* at 93.

At the trial for bad faith, Floyd stated that even had he known of the settlement offers, he

6

would not have accepted them. *Id.* State Farm lost the case and appealed. The court determined that the evidence in the light most favorable to Floyd, was insufficient to find that State Farm had acted in bad faith. *Id.* at 98.

The facts in this case are remarkably similar to those in *Floyd*. The only significant difference is that Defense counsel in *Floyd* told State Farm that the chances of winning were very good and that any defense verdict would be within the policy limits. Here the defense counsel estimated a 45% chance of defeat and a possible verdict ranging from the policy limit to $500,000 above the policy limit.

Goldstein attempts to distinguish *Floyd* on a few other grounds. First, that Floyd testified at trial that he would not have accepted a settlement offer had he known about it. The Virginia Supreme Court relied on this to determine that the offers "would probably have fallen on barren ground." *Id.* at 97. In Clark's deposition, when asked what he would have done had he known about the offer for $925,000, he states, "I don't know what I would have said." (Clark Dep. 90.) However, until this day he maintains that he was not at fault and he told Spence that they should not pay the policy limit. From this, no conclusion could be reached but that, even if notified, the $925,000 offer would probably have fallen on barren ground.

Second, Floyd's father consulted an attorney, while Clark did not. However, Clark knew he had the right to consult an attorney and chose not to. Clark was informed of the risk of an excess verdict and consistently wished to fight the allegations. The fact that he chose not to consult his own attorney while Floyd's father could afford to is irrelevant.

Third, Goldstein argues that "there was ample evidence in *Floyd* that the defendant had crossed over the center line [while here] there is little or no evidence that Haney was negligent.

7

(Pl. Resp. to Def.'s Mot. Summ. J. 12.)  Not only is Goldstein comparing the defendant from one case to the plaintiff in the other, but there were several sources of evidence that demonstrated that Haney was negligent.

Thus, the only consequential fact which distinguishes this case from *Floyd* is that National did not make a settlement offer above $100,000 and did not accept an offer of $925,000 when Waddell suggested offering $100,000 even though she determined that there was a 45% chance of a verdict between $1,000,000 and $1,500,000.  The necessary analysis, then, is whether this demonstrates by clear and convincing evidence that National acted in furtherance of its own interest, with intentional disregard of Clark's financial interest.[1]

*Aetna Cas. & Sur Co. v. Price*, 206 Va. 749, 146 S.E.2d 220 (1966) is instructive on this question.  In the underlying case of *Aetna*, the insurance company refused to settle a claim against the insured doctors within the policy limits, and a judgment in excess of the policy limits was secured against the doctors.  *Id.* at 221.  Not only did the insurance company's own counsel recommend settling for $45,000, but the insured doctors were agreeable to that amount.  *Id.* at 229–30.  The insurance company defied the wishes of its client and did not follow its own counsel's recommendation, and refused to settle for $45,000.

The court in *Aetna* found that it was not bad faith to refuse to accept counsel's settlement recommendations, where it was "completely consistent with its position throughout that [the insured] had not been negligent and was not liable." *Id.* at 230.  Further, the insurer's position "was also consistent with that taken and constantly maintained by [the insured] that he had not been negligent and was not to blame . . . It does not now behoove [the insured] to point out in his

---

1 Goldstein urges me to use the five part test from *Daniels v. Horace Mann Mut. Ins. Co.*, 422 F.2d 87, 90 (4th Cir.

8

brief where he was negligent, thus to impose liability upon [the insurer] for not recognizing his negligence." *Id.*

Finally, the court concluded that in the underlying case liability was a jury question and that obviously the insured and insurer lost. The court noted, however that "that does not mean that [the insurer], after an accurate and complete investigation, aware that if liability was established recovery would exceed the policy limits, heedful of its insured's interests as much as its own, honestly and intelligently weighing the probabilities of success in a trial, acted in bad faith in refusing to settle the [plaintiff's] claims." *Id.*

Similarly here, Clark continually maintained that he was not liable and understood the risk of an excess verdict. National believed, as did Clark, that there was a good chance that the jury would return a defense verdict. Further, Spence and Waddell believed that the facts would support a verdict as a matter of law, and based this on a sound investigation performed by traffic consultants. Unlike in *Aetna*, Clark did not suggest that National should settle, but rather suggested that they should not. Also unlike in *Aetna*, the insurer followed counsel's recommendation on the proper amount for settlement.

It is true that $100,000 seems low given Waddell's assessment of the chances of victory and potential outcome. The next $900,000 beyond National's settlement offer, however, would be assumed by National. Only if the jury went beyond that, and Waddell was not sure this would happen even if the verdict was for the Haneys, would Clark be responsible for any of the damages. This does not constitute clear and convincing evidence that National acted in its own financial interest with intentional disregard of Clark's financial interest. In retrospect, National's

---

1970). *Daniels* applied West Virginia law, and thus is not applicable to this case.

settlement offer seems to have been an error of judgment, maybe even negligent.  But it does not demonstrate bad faith.

**IV.    CONCLUSION**

For the reasons stated herein, even with the facts in the light most favorable to Goldstein, Goldstein can not demonstrate by clear and convincing evidence that National acted in bad faith.  Therefore I will GRANT Defendant's Motion for Summary Judgment.  The Clerk will be directed to send this Opinion and the accompanying Order to all counsel of record, and to DISMISS the case from the docket of this Court.

Entered this 28th day of July, 2008.

s/Jackson L. Kiser  
Senior United States District Judge